IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ZURICH AMERICAN INSURANCE      :        CIVIL ACTION
COMPANY, et al.                :
                               :
          v.                   :
                               :
R.M. SHOEMAKER CO., et al.     :        NO. 12-873


MEMORANDUM

Bartle, J.                                    March 16, 2012

          Plaintiffs Zurich American Insurance Company ("Zurich")
and Northern Insurance Company of New York ("Northern") have
filed this diversity action against their insured R.M. Shoemaker
Co. ("RMS") and against the County of Monmouth ("Monmouth"), a
public body corporate and politic of the State of New Jersey.
Zurich and Northern seek a declaratory judgment pursuant to 28
U.S.C. §§ 2201 and 2202 that they have no duty to defend or
indemnify RMS in a pending New Jersey state civil action brought
by Monmouth against RMS.  See County of Monmouth v. R.M.
Shoemaker Co., Super. Ct. (Law Div.) Monmouth County, NJ No.
MON-L-1204-04.  Monmouth is suing RMS, its general contractor,
for damages arising out of allegedly faulty construction of an
addition to the Monmouth County Correctional Institution in
Freehold, New Jersey.  Northern has defended RMS up to this point
under a reservation of rights.  Before the court is a motion of
Zurich and Northern for summary judgment against RMS and Monmouth
under Rule 56 of the Federal Rules of Civil Procedure.

Zurich and Northern contend they have no obligation to defend or indemnify RMS because the complaint in the underlying lawsuit does not allege that an "occurrence" took place.  Under the Zurich and Northern commercial general liability policies, property damage is covered only when it is caused by an "occurrence."  Property damage is defined in the policies as "[p]hysical injury to tangible property, including all resulting loss of use of that property" and "[l]oss of use of tangible property that is not physically injured."  The term "occurrence" is defined in the polices as "an accident, including continuous or repeated exposure to substantially the same or general harmful conditions."  While the term "accident" is not defined in the policies, its dictionary definition is "'[a]n unexpected and undesirable event,' or 'something that occurs unexpectedly or unintentionally.'"  See Kvaerner Metals Div. of Kvaerner USA, Inc. v. Commercial Union Ins. Co., 908 A.2d 888, 897-98 (Pa. 2006); see also Firemen's Ins. Co. of Newark v. Nat'l Union Fire Ins. Co., 387 N.J. Super. 434, 449 (App. Div. 2006).

To determine whether an "occurrence" is alleged and Zurich and Northern thus have a duty to defend RMS, we must compare the allegations in the underlying complaint[1] to the terms of the policy.  See Kvaerner, 908 A.2d at 896; see also Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 173, 607 A.2d 1255,

---

1.  Monmouth has filed a sixth amended complaint in the underlying action.  For ease of reference, we refer to it throughout this Memorandum as the "complaint."

1259 (N.J. 1992).  The policies in issue, which are identical in all material respects, were effective from September 30, 2000 to September 30, 2004.

I.

As a preliminary matter, we must resolve whether Pennsylvania or New Jersey substantive law applies.  The plaintiffs and Monmouth rely on Pennsylvania law while RMS looks to the law of both states.  RMS, the insured, was located in Pennsylvania and its insurance companies, Zurich and Northern, were licensed to do business here.  The insurance policies were negotiated and signed in Pennsylvania with the involvement of the Graham Company, the insurance broker for RMS which was situated in Philadelphia.  Because the allegedly faulty workmanship by RMS took place in New Jersey and the underlying lawsuit against RMS was filed in that state, any defense of the insured would necessarily take place there.

In diversity actions, courts look to the choice of law rules of the forum state, in this case Pennsylvania, to determine which state's substantive law to apply.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (U.S. 1941).  Pennsylvania follows "a flexible rule which permits analysis of the policies and interests underlying the particular issue before the court and directs courts to apply the law of the state with the most interest in the problem."  Specialty Surfaces Int'l v. Cont'l Cas. Co., 609 F.3d 223, 237 (3d Cir. 2010) (citations omitted).

-3-

The initial step in our analysis requires us to focus on whether there is a "true conflict between the relevant laws" of Pennsylvania and New Jersey. <u>Id.</u>  Under the law of both states, a contractor's faulty workmanship with respect to the work product in issue does not constitute an "occurrence" under the policies.  <u>See</u> <u>Kvaerner</u>, 908 A.2d at 899; <u>Firemen's Ins. Co. of Newark v. National Union Fire Ins. Co.</u>, 387 N.J. Super. 434, 449 (App. Div. 2006).

However, Pennsylvania and New Jersey law diverge when the complaint alleges that the damage as a result of faulty workmanship includes property other than that which was the subject of the insured's workmanship.  In Pennsylvania, faulty workmanship by a contractor which results in damage to additional property of the other party to the underlying contract is not an "occurrence."  <u>See</u> <u>Millers Capital Ins. Co. v. Gambone Bros. Dev. Co.</u>, 941 A.2d 706, 713 (Pa. Super. Ct. 2007).

In contrast, in New Jersey damage to property other than the work product is deemed not predictable and is "an occurrence."  <u>See</u> <u>S.N. Golden Estates, Inc. v. Continental Cas. Co.</u>, 293 N.J. Super. 395, 401 (App. Div. 1996) (citing <u>Weedo v. Stone-E-Brick, Inc.</u>, 405 A.2d 788, 792 (N.J. 1979)).  In <u>Weedo</u>, the New Jersey Supreme Court provided the following illustration:

> When a craftsman applies stucco to an
> exterior wall of a home in a faulty manner
> and discoloration, peeling and chipping
> result, the poorly-performed work will
> perforce have to be replaced or repaired by
> the tradesman or by a surety. On the other
> hand, should the stucco peel and fall from

-4-

the wall, and thereby cause injury to the
homeowner or his neighbor standing below or
to a passing automobile, an occurrence of
harm arises which is the proper subject of
risk-sharing as provided by the type of
policy before us in this case.  The
happenstance and extent of the latter
liability is entirely unpredictable -- the
neighbor could suffer a scratched arm or a
fatal blow to the skull from the peeling
stonework.  Whether the liability of the
businessman is predicated upon warranty
theory or, preferably and more accurately,
upon tort concepts, injury to persons and
damage to other property constitute the risks
intended to be covered under the [commercial
general liability policy].

Weedo, 405 A.2d at 791-92.

Thus, in Pennsylvania, if a contractor constructed a
leaky roof for a house, the policy would not cover the repair to
the roof or to the furniture within the house which was damaged
as a result of the leaky roof.  In New Jersey, the repair to the
leaky roof would not be covered, but the damage to the furniture
would.

While the underlying complaint in the New Jersey state
court mainly alleges damages to the structure which was added to
the Monmouth County Correctional Institution, and for which RMS
was the general contractor, it also alleges damages to "interior,
non-structural, building systems" and "personal property ...
including damages to the electrical systems, the suspended
acoustic tile ceilings and miscellaneous equipment."  Reading the
complaint in favor of Monmouth, it pleads damage to prison
property other than what was constructed by RMS.  Accordingly,

-5-

there is an actual conflict between Pennsylvania and New Jersey
law.

A "true conflict" exists because the interests of both
states "would be adversely affected to some degree by application
of the other state's law." Specialty Surfaces, 609 F.3d at 232.
Pennsylvania has a strong interest in having its law apply here
where the insurance policies were issued in Pennsylvania with the
aid of a Pennsylvania broker by insurance companies licensed to
do business in Pennsylvania to an insured which is incorporated
in and has its principal place of business in Pennsylvania. Id.
New Jersey, in contrast, has an interest in having its law apply
given that the underlying suit was filed by a county of the State
of New Jersey and the alleged property damage occurred at a
correctional facility within New Jersey. Since a true conflict
exists, we must conduct "an analysis of each state's contacts
with the contract[s] of insurance and its interests in having its
law applied to the question at hand." Id. at 233.

Under § 188(2) of the Restatement (Second) of Conflict
of Laws, the following factors are evaluated to determine which
state has greater contacts with the contracts at issue: "(a) the
place of contracting, (b) the place of negotiation of the
contract, (c) the place of performance, (d) the location of the
subject matter of the contract, and (e) the domicile, residence,
nationality, place of incorporation and place of business of the
parties." Id. at 234 (quoting Restatement (Second) of Conflict
of Laws § 188(2)).  The contracts at issue in this case are the

-6-

insurance policies between RMS and its insurers Zurich and
Northern.  The place of contracting and the place of negotiation
of the contracts were in Pennsylvania, and the insurance broker,
the Graham Company, which was acting on behalf of RMS, was
located in Philadelphia.  Thus, the first two factors favor the
application of Pennsylvania law.  <u>Specialty Surfaces</u>, 609 F.3d at
234.

      The third factor is the place of performance.  As in
<u>Specialty Surfaces</u>, the insured performed where it paid its
required premiums.  <u>Id.</u>  Also as in <u>Specialty Surfaces</u>, the
record does not reflect where the premiums were paid, but because
RMS' principal place of business is in Pennsylvania and the
insurance broker is here, we reasonably infer that RMS paid its
premiums in the Commonwealth.  <u>Id.</u>  On the other hand, Zurich and
Northern "perform[] under the contract of insurance where it is
required to defend or pay benefits to [RMS]."  Zurich's and
Northern's duty to defend, if required by the policies, is to be
performed in New Jersey.  This factor does not tilt toward any
party.

      The fourth factor, the subject matter of the contract,
does not favor the application of either Pennsylvania or New
Jersey law.  The policies provided nationwide coverage to RMS.
<u>Id.</u> at 234.

      Finally, we must consider the fifth factor, which is
the domicile, residence, nationality, place of incorporation and
place of business of the parties.  This component of the

-7-

Restatement slightly favors the application of Pennsylvania law because RMS is a Pennsylvania corporation with its principal place of business in Pennsylvania, whereas Zurich and Northern are Illinois citizens with their principal places of business in New York.  No party urges the court to consider the law of either of these states.  We do not take into account Monmouth's location as it was not a party to the insurance policies.

We "must weigh these contacts on a qualitative scale according to their relation to the policies and interests underlying" the issue whether a duty to defend exists.  <u>Specialty Surfaces</u>, 609 F.3d at 234.  Our Court of Appeals has found that the place of contracting, the place of negotiation, and the parties' principal places of business are the most important contacts.  <u>Id.</u> at 235.  The place of contracting and negotiation was Pennsylvania, and the principal places of business of the parties to the insurance contracts are Pennsylvania and New York. The only connection to New Jersey is the place of performance by Zurich and Northern in defending RMS.  In accord with <u>Specialty Services</u>, we find that this is "entitled to relatively little weight."  Considering and weighing all the required factors, we will apply Pennsylvania substantive law in this action.

II.

Under Pennsylvania law, the "interpretation of an insurance contract regarding the existence or non-existence of coverage is generally performed by the court.  <u>Kvaerner</u>, 908 A.2d at 896.  The court looks first to the terms of the policy.  <u>See</u>

-8-

id.  "When the language of the policy is clear and unambiguous, we must give effect to that language." Id. at 897.  On the other hand, "when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured." Id.  Next, as noted above, the terms of the policy are compared to the allegations in the underlying claim.  "[A]n insurer's duties under an insurance policy are triggered by the language of the complaint against the insured." Id. at 896.  Factual allegations of the underlying complaint are to be taken as true and liberally construed in favor of the insured. See Nationwide Mut. Ins. Co. v. CPB Int'l, Inc., 562 F.3d 591, 595-96 (3d Cir. 2009) (citations omitted).

An insurance company's duty to defend is broader than the duty to indemnify. See Frog, Switch & Mfg. Co. v. Travelers Ins. Co., 193 F.3d 742, 746 (3d Cir. 1999).  The duty to defend arises "whenever an underlying company may potentially come within the insurance coverage." Id. (internal quotations omitted).

### III.

The leading case on the duty to defend under the policies in issue is the Pennsylvania Supreme Court's decision in Kvaerner, 908 A.2d 888.  Bethlehem Steel Corporation ("Bethlehem"), in an underlying action, had sued Kvaerner Metals Division of Kvaerner USA, Inc. ("Kvaerner") for breach of contract and breach of warranty in connection with the faulty design and construction of a coke oven battery. Id. at 891.  There was evidence that rain had penetrated the roof of the oven

and caused damage.  Id. at 893.  Kvaerner sought a declaratory
judgment that its general liability insurer had a duty to defend
and indemnify it.  Id. at 892.  The Supreme Court, reversing the
Superior Court, sustained the trial court's grant of summary
judgment in favor of the insurance company.  Id. at 900.  The
Supreme Court held that the alleged damage to Bethlehem's
property caused by faulty workmanship of Kvaerner, its
contractor, is not an "occurrence" under the contractor's
commercial liability policies.  Id. at 899.  Like the policy at
issue here, the policy in Kvaerner defined an "occurrence" as "an
accident, including continuous or repeated exposure to
substantially the same general harmful conditions."  Id. at 897.
The term "accident," the court noted, was not defined in the
policies, but was defined in the dictionary as "'[a]n unexpected
and undesirable event,' or 'something that occurs unexpectedly or
unintentionally.'"  Id. at 897-98.  It explained that the term
"implies a degree of fortuity that is not present in a claim for
faulty workmanship."  Id. at 898.

In Millers Capital Insurance Co. v. Gambone Brothers
Development Co., decided after Kvaerner, the question before the
Pennsylvania Superior Court was whether Millers Capital Insurance
Co. ("Millers") had a duty to defend its insured Gambone Brothers
Development Co. ("Gambone") in two underlying actions in which
Gambone was being sued for property damages to homes it had
developed and built and then sold to the plaintiffs.  941 A.2d
706, 708 (Pa. Super. Ct. 2007).  Water was alleged to have leaked

-10-

through the exterior of the homes and caused damage to non-defective work in the interior of the homes.  <u>Id.</u> at 713.  The Superior Court concluded that the damage to the interior was not an occurrence under the general liability policy issued by Millers.  <u>Id.</u>  It explained:

> ... the [Kvaerner] Court suggested that natural and foreseeable acts, such as rainfall, which tend to exacerbate the damage, effect, or consequences caused *ab initio* by faulty workmanship also cannot be considered sufficiently fortuitous to constitute an "occurrence" or "accident" for the purposes of an occurrence based CGL policy.

<u>Id.</u>

Specialty Surfaces International v. Continental Casualty Co. followed <u>Gambone</u>.  609 F.3d 223 (3d Cir. 2010).  There, the issue before our Court of Appeals was whether Continental Casualty Co. ("Continental") had a duty to defend Specialty Surfaces International ("Specialty Surfaces") and Empire and Associates, Inc. ("Empire") in an underlying suit in which Specialty Surfaces and Empire were being sued for damages to a synthetic turf athletic field.  Specialty Surfaces and Empire, as subcontractors, had manufactured the field and installed a drainage system.  <u>Id.</u> at 227.  The damage alleged in the underlying suit included failures of the drainage system, which led to water leakage and subsequent damage therefrom, as well as insufficiently strong turf material.  The complaint alleged damage as a result of but beyond the faulty work product of the subcontractors.  <u>Id.</u> at 228.  Our Court of Appeals held

-11-

that the underlying suit did not allege an "occurrence," and
accordingly Continental had no duty to defend Specialty Surfaces
or Empire, because under Pennsylvania law, faulty workmanship,
even when causing "damage to property other than the work product
itself," does not constitute an occurrence."  Id. at 231.

    As noted above, Monmouth alleges in the underlying New
Jersey state court complaint that inspection of RMS's work at the
Monmouth County Correctional Institution "revealed omissions,
defects and deficiencies in labor, materials and work" provided
by RMS.  Monmouth also pleads that the work provided by RMS was
not performed in a "good and workman-like manner."  The complaint
further avers that RMS allowed "defective and grossly deficient
work in the construction."  These are claims for faulty
workmanship and thus do not constitute an "occurrence" under the
Zurich and Northern policies even if there was damage to
Monmouth's property other than the property subject to the faulty
workmanship.  See Gambone, 941 A.2d at 713; Erie Ins. Exch. v.
Abbott Furnace Co., 972 A.2d 1232, 1238 (Pa. Super. Ct. 2009).

    The defendants seek to circumvent Kvaerner, decided in
2006, by arguing that we should exercise our discretion not to
apply it retroactively to plaintiffs' policies, which were issued
from 2000 to 2004.  We have no discretion in this regard.
Pennsylvania appellate decisions always apply retroactively,
unless otherwise stated, and the Supreme Court has not otherwise
stated.  See Commonwealth v. Cabeza, 503 Pa. 228, 233 (1983).
Our Court of Appeals has applied Kvaerner to policies issued

before Kvaerner was decided.  See, e.g., Nationwide Mut. Ins. Co.
v. CPB Int'l, Inc., 562 F.3d 591, 595-96 (3d Cir. 2009).  We
reject the defendants' argument as without merit.

          The defendants contend that an occurrence took place
because the underlying complaint is based on claims of negligence
in addition to breach of contract claims.  Artful pleading will
not change the result.  Our Court of Appeals has ruled that
"[f]aulty workmanship, even when cast as a negligence claim, does
not constitute [a fortuitous] event; nor do natural and
foreseeable events like rainfall."  Specialty Surfaces, 609 F. 3d
at 231.

          Monmouth alleges in its underlying complaint that the
faulty workmanship of RMS led to "leakage and other water
infiltrations" which in turn harmed the "interior, non-
structural, building systems" at Monmouth County Correctional
Institution and caused damage to "personal property" and
"electrical systems, the suspended acoustic tile ceilings and
miscellaneous equipment."  Water damage is a foreseeable result
of faulty workmanship.  This type of damage simply lacks the
required "degree of fortuity" for an occurrence to have taken
place, even if couched in terms of negligence.  Kvaerner, 908
A.2d at 898.

          The defendants also contend that an "occurrence" took
place because in the underlying suit Monmouth alleges some fault
was caused by RMS' subcontractors rather than by RMS and RMS
could not have expected that its subcontractors would perform

-13-

careless work.  Faulty workmanship is not transformed into an
"occurrence" under the contractor's insurance policy when a
subcontractor, rather than the insured contractor, is at fault.
See Bomgardner v. State Farm Fire and Casualty, No. 10-1287, 2010
U.S. Dist. LEXIS 96379, at *11 (E.D. Pa. Sept. 14, 2010) (citing
Kvaerner, 908 A.2d at 893).

     Defendants' reliance on Donegal Mutual Insurance
Company v. Baumhammers is inapposite.  938 A.2d 286 (Pa. 2007).
There, a surviving victim and the estates of deceased victims
sued an adult son and his parents for injuries and deaths which
resulted from the son's shooting rampage.  The underlying
complaint alleged that the parents were negligent for failing to
procure adequate mental health treatment for their son, take his
handgun away, and notify the authorities of the fact that he
possessed a handgun.  The parents were insured under a
homeowner's policy issued by the insurer, which filed a
declaratory judgment action seeking to determine whether it had a
duty to provide coverage to the parents.

     The Pennsylvania Supreme Court held that the alleged
negligence of the parents qualified as an "accident," and thus an
"occurrence" triggering their insurer's duty to defend.  Id. at
293.  The court explained that the "extraordinary shooting spree
embarked upon by [their son] ... cannot be said to be the natural
and expected result of Parents' alleged acts of negligence."  Id.
In contrast to Kvaerner and its progeny, there was no contractual

relationship between the insured and the victims of the shootings in Baumhammers.

The faulty workmanship at the Monmouth County Correctional Institution, whether committed by RMS or its subcontractors, was not "unexpected, undesigned and fortuitous," even if water or leaks contributed to the damage.  Id.  In Pennsylvania, property damage resulting from faulty workmanship under a contract is reasonably foreseeable and does not have the "degree of fortuity" required for an accident to occur. Kvaerner, 908 A.2d at 898.  This is true even if property of a contracting party other than the faulty work product is damaged. See Gambone, 941 A.2d at 713; Erie, 972 A.2d at 1238.  Since the underlying complaint is based on faulty workmanship, no "occurrence," as defined in the policies in issue, took place.

The defendants rely on the District Court of New Jersey cases decided under Pennsylvania law.  See Schuylkill Stone Corp. v. State Auto. Mut. Ins. Co., 735 F. Supp. 2d 150 (D.N.J. 2010); Wausau Underwriters Ins. Co. v. State Auto. Mut. Ins. Co., 557 F. Supp. 2d 502 (D.N.J. 2008).  In Wausau, the issue before the court was whether Wasau Underwriters Insurance Co. had a duty to defend Schuylkill Stone, Inc. ("Schuylkill") in an underlying state court lawsuit in the Superior Court of New Jersey in Burlington County.  Wausau, 557 F. Supp. 2d at 504.  The underlying suit alleged defects in property caused by defective design, construction, and workmanship.  Id. at 505.  However, Schuylkill became involved in the underlying suit when one of the

-15-

original defendants filed a third-party complaint against it, as supplier of materials used in the construction, seeking contribution and indemnification.   Id.

The Wausau court relied on Baumhammers and held that property damage "allegedly caused by the negligent acts of the insured may be a sufficiently fortuitous event to constitute an 'accident' and therefore an 'occurrence.'"   Id.   However, the court decided this case prior to Specialty Surfaces which, as discussed above, held that under Pennsylvania law "[f]aulty workmanship, even when cast as a negligence claim, does not constitute [a fortuitous] event...."   609 F.3d at 231. Furthermore, the district court premised its reasoning on the fact that there was no contractual relationship between the plaintiff in the underlying action and the defendant insured, which was also the defendant in the declaratory judgment action in the District Court.   Id. at 514.   In contrast, in the present case there was a contractual relationship between Monmouth and RMS.

In Schuylkill Stone, the underlying facts were the same as those in Wausau.   735 F. Supp. 2d at 152.   However, a different insurance company, here State Automobile Mutual Insurance Company, was asserting that it had no duty to defend Schuylkill Stone.   Id.   The court relied heavily on the opinion in Wausau, and also did not cite Specialty Surfaces, 609 F.3d at 231.   Like Wausau, there was no contractual relationship between

-16-

the underlying plaintiff and Schuylkill.  We do not find <u>Wausau</u> or <u>Schuylkill Stone</u> persuasive.

Finally, the defendants argue that any subcontractor's faulty workmanship is an "occurrence" because one of the exclusions to the Northern and Zurich policies provides, "[t]his insurance does not apply to ... '[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'  This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor."  Because we have determined that there was no "occurrence" and thus the Northern and Zurich policies were not triggered, any exclusion in the policies, and their attending exceptions, do not affect our conclusion.  See <u>Kvaerner</u>, 908 A.2d at 898.

In conclusion, Monmouth sued RMS for faulty workmanship and no "occurrence" as that term is defined in the Zurich and Northern policies is alleged in the underlying complaint.  Zurich and Northern have no duty to defend or indemnify RMS.  We will thus grant summary judgment in favor of the plaintiffs and against the defendants RMS and Monmouth.